# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| JANICE R. JENKINS, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No.:  7:13-cv-00977-RDP |
| | } | |
| TUSCALOOSA CITY BOARD OF EDUCATION, | } | |
| | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant's Motion for Summary Judgment (Doc. 28), filed August 12, 2014.  The Motion (Doc. 28) has been fully briefed.  (Docs. 30, 32, 34, 37, 40). Plaintiff Janice Jenkins asserts that Defendant Tuscaloosa City Board of Education violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., and the Civil Rights Act of 1866, 42 U.S.C. § 1981.  (Doc. 1 at 1).  In particular, the Complaint asserts race discrimination claims (Counts One and Three), retaliation claims (Counts Two and Four), and a state law conversion claim (Count Five).  (Doc. 1 at 10-17).  The claims before the court are only those set forth by Plaintiff in her Complaint.[1]

---

[1] In Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Plaintiff argues the court should also entertain hostile work environment and racial harassment claims not stated in her judicial complaint.  (Doc. 32 at 21).  However, the "liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a) . . . does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage."  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).  "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).  A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."  *Gilmour*, 382 F.3d at 1315.

Initially, in her original Complaint, Plaintiff asserted that her transfer to a different school was unlawful discrimination in violation of Title VII and § 1983. However, as Plaintiff has discovered after making that assertion, the U.S. Department of Education's Office of Civil Rights ("OCR") investigated a parent complaint which targeted Plaintiff. As part of the resolution of that Complaint, OCR demanded Plaintiff's transfer or termination based on the conduct that OCR concluded to be discriminatory. Faced with this discovery, Plaintiff ran in a new direction. That is, she shifted her theory, suggesting for the first time in her Response to Defendant's Motion for Summary Judgment that Defendant discriminated against her by subjecting her actions to a heightened level of scrutiny. The court addresses this shift below and, after a careful review of the record and the arguments made in this case, the court concludes that the undisputed Rule 56 record evidence does not permit Plaintiff to establish any of her federal claims. Therefore, Defendant's Motion (Doc. 28) is due to be granted on each of Plaintiff's federal claims. Accordingly, because all of her federal claims are due to be dismissed, and it was those claims that provided a basis for federal question jurisdiction in this action, the court declines to exercise supplemental jurisdiction over Plaintiff's state law conversion claim.

## I.     Procedural History

On April 30, 2012, Plaintiff filed a Charge of Discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC"). (Ex. 1-A, EEOC Charge, at 2 (Charge No. 846-2012-43001)). Plaintiff's Charge asserted claims for discrimination based on race and retaliation. (*Id.*) On February 21, 2013, Plaintiff received a Notice of Right to Sue from the EEOC. (Doc. 1, Ex. B, EEOC Notice of Right to Sue, at 4).

On May 22, 2013, Plaintiff filed this action asserting violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), and the Civil Rights

Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981").  (Doc. 1 at 1).  The Complaint asserts race discrimination (*i.e.*, disparate treatment) claims (Counts One and Three), retaliation claims (Counts Two and Four), and a state law conversion claim (Count Five).  (Doc. 1 at 10-17).

## II.    Standard of Review

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* 249.  The Eleventh Circuit has "consistently held that conclusory allegations without specific supporting facts have no probative value."  *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).

### III.   Facts[2]

####    A.      Background

During the 2011-2012 school year, Plaintiff Janice Jenkins was a paraprofessional (*i.e.*, instructional aide) with the STARS Academy.  (Ex. 1, Jenkins Dep. 23:14-15).[3]  The STARS Academy was an alternative program for children with behavioral problems run by Defendant. (*Id.* at 37:18-22, 24:6-18; Ex. 3, Plott Dep. 24:4-9).  Initially, the program was housed at the Tuscaloosa Magnet School, but for the 2011-2012 school year, the program was moved to Skyland Elementary School, where Dr. Cheryl Fondren was the principal.  (Ex. 1, Jenkins Dep. 24:21-23; Ex. 6, Fondren Aff. ¶¶ 4-5).

Both Plaintiff and Rita Pate, another paraprofessional, were assigned to work with teacher Carol Plott's class for third through fifth grade students.  (Ex. 1, Jenkins Dep. 39:6-10; Ex. 3, Plott Dep. 22:16-20).  As paraprofessionals, Plaintiff and Pate's duties included helping the students with homework and class work, as well as with bathroom and lunchroom breaks. (Ex. 1, Jenkins Dep. 34:10-23; Ex. 2, Pate Dep. 18:15-19:15).

At all times relevant to the litigation, Dr. Paul McKendrick was the Superintendent of Defendant Tuscaloosa City Board of Education. (Ex. 10, McKendrick Dep. 10:8-11:9).  Dr. Michael J. Daria was employed with the Defendant as the Assistant Superintendent of General Administration.  (Ex. 5, Daria Aff. ¶ 2).  In this position, Daria was responsible for general operations, including transportation, health services, child nutrition program, social services,

---

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[3] For clarity, the court references the evidentiary record using the same citation format as found in Defendant's Brief.  (Doc. 30).

student attendance, and student discipline. (*Id.* at ¶ 3). Several incidents form the heart of this controversy, and each is outlined separately below.

### B.      Work Assignments

During the 2011-2012 school year, Fondren informed Daria of numerous complaints about classroom conflicts between Plaintiff and her assigned teacher, Plott. (Ex. 6, Daria Aff. ¶ 9; Ex. 6, Fondren Aff. ¶ 6). Plaintiff alleges that Plott treated her less favorably than her white co-worker Pate. (Ex. 1, Jenkins Dep. 38:19-39:2; Ex. 7, Fondren Dep. 32:14-18). Plott "usually gave Rita Pate . . . work to do instead of Plaintiff." (Doc. 1 at ¶ 9). Furthermore, Plott would usually send Plaintiff out for copies while Pate stayed in the classroom to help Plott. (Ex. 1, Jenkins Dep. 42:10-14, 43:5-8). Plaintiff claims the disparity in work assignments was related to an earlier discussion between Plott and Plaintiff, where Plaintiff admonished Plott for Plott's discriminatory comments about a black beauty contestant. (*Id.* at 42:2-10). At all times, the tasks given to Plaintiff were within her job duties as a paraprofessional. (*See id.* at 34:10-23; Ex. 2, Pate Dep. 18:15-19:15).

As a result of the tension between Plaintiff and Plott, from the first day of school, August 5, 2011, through late September 2011, Fondren had several meetings with Plaintiff, Pate, and Plott regarding "mutual respect," "use of cell phones," the "roles of teachers and para[professionals]," and "the importance of working as a team." (Ex. 7, Fondren Dep. 33:19-34:1). She also addressed with them "work assignments with district leadership" (*id.* at 35:14-17) and "that everyone should have . . . equal workloads" (*id.* at 36:8-9).

Plaintiff also accuses Plott of raising her voice at Plaintiff on a separate occasion, (Ex. 2, Pate Dep. 30:7-17), and that Plott "screamed" at her for no reason. (Ex. 1, Jenkins Dep. 55:16-56:1). Pate reported details regarding the confrontation:

> Plott was upset and trying to figure out why Ms. Jenkins didn't like her and why she . . . refused to be part of the team and work with us as a team.  And when she would ask Ms. Jenkins to do something, Ms. Jenkins wouldn't do it or chose not to do it or would leave the room.

(Ex. 2, Pate Dep. 30:22-31:7).   At this point, Plott walked over to Plaintiff and said, "What . . . can I do to make you . . . like me and work together?"  (*Id.* at 31:10-13).  Plaintiff only repeated, "Something is going to go down today."  (*Id.* at 31:13-20).

### C.      The October 3, 2011 Incident Involving Restraint of a Student

On October 3, 2011, T.R., a student at Skyland Elementary School, became violent and attempted to leave campus and run into the street.  (Ex. 6, Fondren Aff. ¶ 15).  His teacher attempted to restrain him, along with the assistance of Principal Fondren and other educators. (*Id.* at ¶ 15).  At some point, after the Skyland staff got T.R. inside the school, Plaintiff inserted herself into the fray.  Plaintiff approached the scuffle in the hallway, stating that she knew what to do and was trained to handle these situations.  (Ex. 7, Fondren Dep. 56:1-6).  Accounts from the staff regarding what happened next vary.  (*See* Ex. 6-H, Unusual Occurrence Forms, Oct. 3, 2011).

Plaintiff claims that as Plaintiff and Pate were returning to the building after loading students onto the bus to go home, they heard a child screaming.  (*Id.* at 67:4-8).  Plaintiff and Pate encountered Fondren and three other Skyland employees restraining T.R. in a hallway near their classroom.  (*Id.* at 67:8-12).  Plaintiff recounts:

> [T]hey had a little boy down on the floor. One of them had him around the neck, Ms. Burton had her knee in his back, and Dr. Fondren was holding his leg, and Ms. Irvin was holding on to him.  So he was just screaming, . . . .  "[G]et these bitches off of me. . . . I can't breathe."

(*Id.* at 67:12-19).  After seeing the child was T.R., Plaintiff claims to have kneeled down on the floor near to him, and tried to calm him down, saying "they'll get up off of you, . . . but you got to calm down first."  (*Id.* at 67:20-68:1-3).  T.R. allegedly responded, "no, Ms. Jenkins, . . . they

still got — this bitch got her knee in my back." (*Id.* at 68:3-5).  Plaintiff says she observed that

T.R. was "hyperventilating like he couldn't breathe," (*id.* at 68:6-8), so she told Fondren:

> [W]hen a child tells you they can't breathe . . . you're supposed to get up off of
> him. . . . [T]his child don't weigh 85 pounds, and . . . there's four of y'all on him.
> You're supposed to let him up when he says he can't breathe. So I talked to him
> to like calm him down.  I was -- they had got him calm."

(*Id.* at 68:8-14).  Plaintiff alleges that as she was getting T.R. up to take him in the office,

inexplicably the other staff members "tackled him again." (*Id.*)

Accounts provided by others about this incident vary significantly.  Several employees

report that Plaintiff took T.R. from Early and flipped him onto his stomach and placed her knee

in the student's back, thereby obstructing his breathing.  (*See* Ex. 3, Plott Dep. 44:18-45:18; Ex.

6, Fondren Aff. ¶ 15; Ex. 6-H, Burden Unusual Occurrence Form, Oct. 3, 2011, at 35; Ex. 6-H,

Early Unusual Occurrence Form, Oct. 3, 2011, at 36; Ex. 7, Fondren Dep. 56:8-16).  Some

observers suggest Barbara Rainey, Plaintiff's sister and the child nutrition program manager for

Skyland, ultimately caused Plaintiff to release T.R.  (*See* Ex. 3, Plott Dep. 45:19-46:5 (claiming

Rainey said "Janice, you better get off that kid. Janice, let him go."); Ex. 6-H, Foster Unusual

Occurrence Form, Oct. 3, 2011, at 32 (claiming Rainey said "Janice leave him alone," and "get

your hands off that boy."); Ex. 7, Fondren Dep. 56:20-57:5 (claiming Rainey said "Janice, get off

that boy.")).

In her October 3, 2011 Unusual Occurrence Form, Pate suggests that along with Plaintiff,

"Ms. Early and Ms. Burden were holding [T.R.] down too," and "Ms. Burden had her knee down

into his back and stayed there until Ms. Jenkins started trying to get him to stand up as Ms.

Fondren suggested."  (Ex. 6-H, Pate Unusual Occurrence Form, Oct. 3, 2011, at 39).  Plaintiff

also argues the written statement she gave to Fondren regarding the incident was never turned in

to Defendant so that the incident could be investigated.  (Ex. 1, Jenkins Dep. 70:1-71:18).

Fondren is on record as saying she believed Plaintiff's restraint of T.R. seemed "excessive, given the circumstances."  (Ex. 6, Fondren Aff. ¶ 15 ("[Plaintiff's] restraint method was excessive in the opinion of the educators present, including myself.  [Plaintiff's] excessive restraint of the student put the safety of the student as [sic] risk.")).  Accordingly, on October 4, 2011, Fondren advised Daria and Vicki Brown, Defendant's Director of the Office of Student Services, that she wanted to implement certain procedures and reinforce Defendant's current restraint policy.  (*Id.* at ¶¶ 16-17).[4]

On the same day, Fondren implemented a new and updated Skyland policy by drafting a memorandum on student altercations and physical restraint (Ex. 6-J, Fondren Memo, Oct. 4, 2011, at 47) and a memorandum on behavioral issues (*id.* at 48).  Fondren held a faculty and staff meeting to discuss the same.  (Ex. 6, Fondren Aff. ¶ 17).  Fondren claims Plaintiff attended (*id.*); Plaintiff claims she does not recall attending.  (Ex. 1, Jenkins Dep. 105:15-23).  Ultimately, neither Plaintiff nor any of the other employees involved in the restraint of T.R. were disciplined.

### D.     The October 20, 2011 Incident

On October 20, 2011, an incident occurred which involved Odessa Dumas, a Skyland teacher, and Fondren.  Dumas became upset after Fondren informed her that she would not have a student-teacher in her classroom.  (Ex. 6, Fondren Aff. ¶ 18).

Plaintiff claims that she found Dumas crying and took her to an empty room.  (Ex. 1, Jenkins Dep. 63:1-8).  Shortly thereafter, Fondren came to speak with Dumas, but Dumas left the room to get away from Fondren.  (*Id.* at 63:5-12).  At this point, the facts surrounding this incident are disputed.

---

[4] (*See also* Fondren Email, Oct. 4, 2011, at 44) ("I was very concerned over the assistance provided by Ms. Jenkins.  Several teachers have come to me with concerns about the amount of force used.  While I believe she was trying to implement the strategies taught to her, I am not certain these were executed as instructed.  Moreover, she has taken several opportunities to discuss this incident with other school employees, the student social work interns, as well as my secretary.  In these discussions, the incident looks very different from what the rest of us observed.").

Plaintiff alleges that she did not see anything else and assumes Dumas went back to her room. (*Id.* at 63:12-15). Fondren claims Dumas intentionally pushed her as Dumas left the room. (Ex. 7, Fondren Dep. 40:18-42:11). Fondren testified that someone from STARS may have seen the incident, but that she couldn't remember if anyone was in close proximity. (*Id.* at 44:4-17). Plaintiff alleges Fondren twice requested Plaintiff to fabricate a statement that Dumas "bumped into" Fondren. (Ex. 1, Jenkins Dep. 64:1-5). Plaintiff says that, because she had not seen the contact, she refused to write a false statement. (*Id.*)

### E.      The November 3, 2011 Verbal Altercation

Plott and Lindsey Blevins, a school counselor, reported that on November 3, 2011, Plaintiff verbally taunted and threatened K.T., a STARS student. (*See* Ex. 6, Fondren Aff. ¶ 20). According to Plott, K.T. was being unruly in her class, and Foster was brought in to help calm him down. (Ex. 3, Plott Dep. 62:6-16). At this time, Blevins left her room to speak with Pate in Plott's classroom across the hall. (Ex. 6-M, Blevins Email, Nov. 4, 2011, at 12). While Blevins was occupied with Pate, Plaintiff and Foster took K.T. from the classroom into the hallway and eventually into Blevin's empty room. (*Id.*; Ex. 3, Plott Dep. 62:17-23). Plaintiff and Foster closed the door, which was locked, and begin yelling at K.T. (Ex. 6-M, Blevins Email, Nov. 4, 2011, at 12).

Michael Anne Jackson, the reading coach at Skyland, was passing Blevin's room and heard Foster "speaking loudly" to a student. (Ex. 6-M, Jackson Email, Nov. 3, 2011, at 13; Ex. 6-M, Blevins Email, Nov. 4, 2011, at 12; Ex. 9, Blevins Dep. 31:16-9). Jackson first stuck her head in the classroom and told Plaintiff and Foster that they needed a certified teacher with them in the room and then left to tell Blevins and Plott the same. (Ex. 6-M, Jackson Email, Nov. 3, 2011, at 13; Ex. 3, Plott Dep. 63:6-15; Ex. 9, Blevins Dep. 31:16-9). Blevins and Plott

immediately came to Blevins's classroom and allegedly observed Plaintiff in the student's face telling him to "go ahead and hit her."  (Ex. 6-M, Blevins Email, Nov. 4, 2011, at 12; *see also* Ex. 3, Plott Dep. 63:18-22).  On December 5, 2011, Fondren sent a Memorandum to Plaintiff stating:

> On November 3, 2011, an incident occurred with [K.T.]  In this incident you and another paraprofessional met with a child behind locked doors without the supervision of certified personnel.  Reports indicate you placed yourself in his physical space, face to face and chest to chest, and yelled at him.  This is not following our school policy . . . .

(Ex. 6-O, Fondren Memo, Dec. 5, 2011, at 33).  Plaintiff, in her deposition testimony, denied the allegations that she was in K.T.'s face yelling at him.[5]  (*See* Ex. 1, Jenkins Dep. 95:1-97:16). Plaintiff suggests that she first learned of the verbal taunting allegations when she was put on administrative leave in December 6, 2011.  (*Id.* at 95:14-18).

### F.      The November 4, 2011 Restraint Incident

On November 4, 2011, Plaintiff was engaged in a second incident with K.T.  (Ex. 6, Fondren Aff. ¶ 21).  In this incident, Plaintiff is alleged to have "unnecessarily restrained the student after verbally attacking him, [and] threatening to beat him."  (*Id.* at ¶ 21).  Although several aspects of the incident are disputed, the fact that an altercation occurred is not.  K.T. became disruptive and physically violent in Plott's classroom and had to be restrained after he

---

[5] (Ex. 1, Jenkins Dep. 97:2-16) (Plaintiff testifying as follows:

Q. So [Fondren's] statement, . . . 'As required by Board policy, I've investigated this allegation and received statements from witnesses indicating you were face-to-face and chest-to-chest with the student making taunting statements such as; go ahead hit me, cause then you will be laying on the floor; I wish you would.'

A. That's not true.

Q. You did not make those statements?

A. No, I did not.

Q. Were you face-to-face or chest-to-chest with him?

A. No, I was not.").

insulted and accosted Plott, and after Pate tripped over him.  (Ex. 1, Jenkins Dep. 73:12-74:17; Ex. 2, Pate Dep.,44:18-49:7; Ex. 3, Plott Dep. 48:8-55:23).

Plott called a police officer when the situation began to escalate, but the officer did not arrive for more than an hour. (Ex. 3, Plott Dep. 53:10–54:3).[6]  Plott first attempted to restraint K.T. and eventually let him go.  Because K.T. was still disruptive, Plaintiff also restrained K.T. after both Pate and Plott were injured.  (*Id.* at 50:2-55:11; Ex. 1, Jenkins Dep. 73:3-74:9, 80:2-23).  Plaintiff suggests she was "forced to restrain the student alone, despite his disruptive and unruly behavior, because 'nobody else would do anything.' " (Jenkins Dep. 84:2-85:5).  After Plaintiff restrained him, K.T. eventually calmed down.  (Ex. 3, Plott Dep. 55:6-10).

The disputed details of the incident involve the aggressiveness of Plaintiff's actions in restraining K.T.  It is undisputed that Plaintiff eventually put K.T. on his stomach with his hands behind his back for several minutes.  (Ex. 1, Jenkins Dep. 83:8-84:12).

Plaintiff's account of the incident suggests that she had a relatively peaceful role in the altercation.  (*See id.* at 74:12-79).  Plaintiff has testified that she restrained K.T. by merely sliding out of her "seat all the way down to the floor." (Ex. 1, Jenkins Dep. 74:10-17).  Plaintiff also testified that the restraint training she had received from Defendant proved ineffective.  (*Id.* at 144:12-19).

But, both Plott and Pate's accounts indicate Plaintiff was more aggressive.  (*See* Ex. 3, Plott Dep. 54:20-11; Ex. 2, Pate Dep. 45:8-47:20).  Plott testified that, at one point, Plaintiff told K.T. to "come on and hit me." (Ex. 3, Plott Dep. 55:10-11).  To the contrary, Plaintiff alleges that it was Plott who said this.  (Ex. 1, Jenkins Dep. 128:5-7).

---

[6] Daria testified that he only learned of the police being called "after the fact," and that he learned this information from Plaintiff, not Fondren.  (Daria Dep. 46:17-20).

The extent of training which Plaintiff received related to physical restraint of students is disputed.  Plaintiff has testified she did not know if the restraint technique she used was in compliance with Defendant's policy, "because during that time, we hadn't had any restraint classes in about four years."  (*Id.* at 92:21-93:3).  Defendant's summary judgment evidence suggests that a training session may have been held as recently as August 11, 2011, before the beginning of the 2011-2012 school year.  (Ex. 6-O, Fondren Memo, Dec. 5, 2011, at 34).[7] Defendant's Human Resources Director, Billie Kay Wingfield, admits he does not know what is actually provided in the restraint training given to school employees.  (Ex. 8, Wingfield Dep. 24:12-25:1).  Regardless, according to Plaintiff, even if the training was held, she did not attend.  (Ex. 1, Jenkins Dep. 104:15-23; *see also* Ex. 4, Daria Dep. 89:20-92:23 (claiming restraint training occurred in August 2011, but that he had no firsthand knowledge of it because he was not there)).

Plaintiff testified that about a week after the incident took place Plott, Pate, and Plaintiff were interviewed by the Tuscaloosa Police Department at Skyland. (*Id.* at 75:12-19).  During Plaintiff's discussion with the investigating officer, Plaintiff demonstrated a restraint technique that she claims to have used on K.T. (*Id.* at 76:2-7).  According to Plaintiff, the officer stated he did not have a problem with the demonstrated technique.  (*Id.*)

_____

[7] (Ex. 6-O, Fondren Memo, Dec. 5, 2011, at 34):

> "In August, 2011, the Tuscaloosa City Schools provided all paraprofessional staff members in the correct procedures for using physical restraint." Also, on "October 4, 2011 in a staff meeting, we discussed the importance of using appropriate restraint techniques to ensure a student's airway is not blocked and he/she is able to breathe.  We specifically discussed the importance of NOT placing a child face down on the floor."

(*See also* Ex. 7, Fondren Dep. 102:19-103:4).

### G.      Plaintiff's Placement on Administrative Leave and Investigation of Her

On December 5, 2011, Fondren provided Daria with statements and reports completed by the witnesses and participants in the November 3 and November 4 incidents. (Ex. 6, Fondren Aff. ¶ 22).   On December 6, 2011, Daria placed Plaintiff on administrative leave while an investigation was to be conducted.   (Ex. 5, Daria Aff. ¶ 14-15).   As a result of Daria's investigation, on March 8, 2012, Daria issued a written letter of reprimand to Plaintiff due to her (1) inappropriate verbal taunting and (2) excessive restraint, in violation of Defendant's restraint policy during the November incidents involving student K.T.  (*Id.* at ¶ 16).

According to Plaintiff, after Plaintiff had been placed on administrative leave for "about a month," at the direction of her "ABA rep,"[8] Plaintiff participated in an interview with the Tuscaloosa Police at her home regarding the November 4 restraint.  (Id. at 77:22-78:9).  During her discussions with the investigating officer, Detective Corey Burns, Plaintiff demonstrated what she claimed was the restraint technique she used on K.T.  (*Id.* at 78:10-78:15).  Plaintiff claims Burns told her that he did not have a problem with Plaintiff's restraint technique, but did have a problem with the delay in which the incident was reported from Fondren to Daria.  (*Id.* at 78:15-20).

### H.      The Ms. Bryant Incident

While Plaintiff was on administrative leave, Plaintiff was informed of yet another improper restraint allegation involving a Skyland employee (which had not been investigated). Plaintiff believes that a "Ms. Bryant,"[9] another white school employee, was observed by Sara Jordan, the Skyland janitor, picking a student up by his neck but claims that incident was not

---

[8]  The court understands this to refer to Plaintiff's "AEA" (or Alabama Education Association) representative.

[9]  Plaintiff does not know Ms. Bryant's first name.  (Ex. 1, Jenkins Dep. 185:19-22).

investigated.  (Doc. 32 at 23).  Jordan allegedly handed Plaintiff a note at the grocery store informing Plaintiff of the incident.  (Jenkins Dep. 154:22-155:21).  Plaintiff never spoke to Jordan about the Ms. Bryant incident because while Plaintiff was on administrative leave Plaintiff was told to avoid communicating with Skyland employees.  (*Id.* at 155:17-156:1). Plaintiff has testified that she did not know what action, if any, was taken against Ms. Bryant. (*Id.* at 155:17-21).  There is no indication in the record that Plaintiff (or anyone else for that matter) reported the Ms. Bryant incident to an appropriate official of Skyland. Nor does the Rule 56 record reflect that any Skyland supervisor was aware of any alleged misconduct by Bryant.

## I.     The Alleged Conversion

Although a box of Plaintiff's personal effects was returned to Plaintiff by her sister, Rainey, Plaintiff claims several personal items were never returned, including her mother's obituary, a bracelet given to her by her mother, and two notebooks of "documentation," which Plaintiff agreed were akin to journals.  (*Id.* at 122:12-123:12, 183:2-7).  Pate boxed up Plaintiff's belongings once she learned Plaintiff was not returning to Skyland, and Plott locked the belongings in a closet. (Ex. 3, Plott Dep. 70:3-71:1).  Rainey picked the box up from Pate.  (Ex. 2, Pate Dep. 33:5-6).  Wingfield never verified that Plaintiff was provided with all of her belongings that were left at Skyland Elementary when she was transferred.  (Ex. 8, Wingfield Dep. 60:23-61:1).

## J.     The Office of Civil Rights Complaint

On January 13, 2012, K.T.'s mother filed a complaint with the United States Department of Education's Office of Civil Rights ("OCR"), alleging that K.T. had been discriminated against on the basis of his color and disability.  (Ex. 10, McKendrick Dep. 84:3-9; Ex. 11, OCR Letter, Feb. 22, 2012, at 6).  K.T.'s mother leveled a number of allegations at Plaintiff.  She claimed

Plaintiff harassed K.T. by telling him that his mother had "created a fat, black animal," called him fat and black repeatedly, falsely accused K.T. of attacking other teachers, and threatened him if he told anyone about these incidents. (Ex. 10, McKendrick Dep. 83:21-84:9, 86:9-19; Ex. 11, OCR Letter, Feb. 22, 2012, at 6).

The OCR investigated the incident involving Plaintiff and K.T.  OCR also looked into the services provided to the student.  (Ex. 11, OCR Letter, Feb. 22, 2012, at 6).  As a result of the incident with Plaintiff and K.T., the OCR conducted an investigation which resulted in a Resolution Agreement with the Defendant.  (Ex. 10, McKendrick Dep. 83:21-84:9).  Because Defendant settled the claim, the OCR investigation never reached final findings or conclusion as to Plaintiff or Defendant's liability.  (*See* Ex. 11, OCR Letter, Feb. 22, 2012, at 7).[10]

As part of its Resolution Agreement with the OCR, Defendant was required to provide training to staff regarding certain "Section 504"[11] implications.  (*See* Ex. 11, OCR Resolution Agreement, July 9, 2012, at 1).  Defendant was also required to change Plaintiff's duties to that

---

[10] Plaintiff has filed a Motion for Sanctions (Doc. 31) against Defendant's counsel for an alleged misrepresentation of fact regarding the OCR investigation.  In Defendant's Brief in Support of Motion for Summary Judgment (Doc. 20), Defendant stated: "According to Dr. McKendrick, the Office of Civil Rights' investigation determined that Ms. Jenkins had been verbally abusive with student K.T."  (Doc. 30 at ¶ 29).  The court notes that the OCR very clearly made no formal conclusion regarding the incident's involving K.T., in part because Defendant entered the Resolution Agreement with that agency.  Defendant argues that the statement of fact was intended to represent the informal findings by the OCR that were communicated to Defendant, which caused Defendant to settle the claim.

The court understands Defendant's statement in its appropriate context.  The court recognizes that Defendant's statement of this fact is poorly crafted, but also understands Defendant's position is that the statement is not without a basis in reality.  For the purposes of summary judgment, the court resolves all reasonable doubts about the facts and all justifiable inferences in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  Therefore, for the purposes of the Motion (Doc. 29), the court accepts that the OCR made *no* findings of fault with Plaintiff specifically.  Nevertheless, the court also understands that if OCR's investigation had found no factual basis for K.T.'s mother's assertions, there would have been nothing to settle. At the conclusion of OCR's investigation, it is undisputed that OCR and Defendant entered into a Resolution Agreement, and that included a provision in which the parties to that contract agreed that Defendant would transfer or terminate Plaintiff. For these reasons, the court concludes Plaintiff's Motion for Sanctions (Doc. 31) is due to be denied.

[11] As McKendrick explained in his deposition, Section 504 is a section of the Rehabilitation Act of 1973 (codified as amended at 29 U.S.C. § 794), and the Defendant views it as "an option for students who have disabilities that don't necessarily receive the designation of a special education student but we try to provide the options and opportunities for students to help them learn as best they can."  (Ex. 10, McKendrick Dep. 85:14-21).

of a library aide.  (*Id.* at 3).   Moreover, Defendant was obligated to inform all families of children who had been supervised or contacted by Plaintiff of the school's policies regarding seclusion and physical restraint, and provide them with contact information should they have questions or wish to file a complaint.  (*Id.* at 3).   Finally, the Resolution Agreement required Defendant to initiate termination proceedings if Ms. Jenkins refused the library aide position. (*Id.* at 3).

## K.      Plaintiff's Transfer to Oak Hill from Skyland

On February 22, 2012, Plaintiff, Wingfield, and the parties' legal counsel met.   During that meeting, legal counsel for Defendant brought up the OCR complaint made by K.T's parent. (Jenkins Dep. 90:22-92:20).   Plaintiff advised Defendant she did not want to return to Skyland, and Plaintiff was informed that she would be transferred to Oak Hill, another of Defendant's schools.  (*Id.* at 113:13-16).   Accordingly, Plaintiff returned to work with Defendant at Oak Hill as a library aide on February 27, 2012.  (*Id.* at 111:6-8).

## L.      The March 2012 Complaint

In March 2012, Jenkins lodged a complaint with Defendant alleging racial discrimination under Title VII and § 1983.  Defendant investigated Plaintiff's harassment complaint. (Pl.'s Ex. 2 to Def.'s Ex. 10, Wingfield Email, March 29, 2012).   On December 27, 2012, David Ryan, a representative for the Defendant, produced the results of the investigation to the EEOC.  (*Id.*)

Defendant's investigation concluded that Plaintiff's claim of discrimination was "pure fantasy."  (*Id.* at 1).   Among other findings, Defendant found that it was Plaintiff's improper actions in verbally taunting and physically injuring a student, which resulted in an OCR investigation, and that investigation led to her transfer in lieu of termination — not Defendant's alleged harassment.  (*See id.*).   The letter suggests that Plaintiff's March 2012 harassment

allegation was part of a broader story in which each time Defendant took steps to address Plaintiff's employment issues (*e.g.*, sleeping on the job, failing to clock out, threatening other employees and students), Plaintiff countered with allegations of harassment.  (*Id.* at 2).

Although the letter is replete with accounts of Plaintiff's misconduct (*id.* at 2), the investigation revealed no basis for any discrimination by Defendant.  (*Id.* at 3 (indicating discriminatory retaliation was a "factual impossibility")).   Additionally, the investigation concluded that, notwithstanding Plaintiff's continued employment with defendant, "[a]ny objective review of [Plaintiff's] employment history makes it readily apparent that she should have been terminated, probably long ago."  (*Id.*)

## IV.    Discussion

The claims implicated by Defendant's Motion for Summary Judgment (Doc. 28) are only those set forth in Plaintiff's Complaint alleging race discrimination under Title VII and § 1983, and Plaintiff's state law claim for conversion.   (Doc. 1). For the reasons outlined below, Defendant is entitled to summary judgment as a matter of law on all Plaintiff's federal claims, and the court will decline to exercise supplemental jurisdiction over the remaining state law claims.

### A.    Discriminatory or Retaliatory Claims Accruing Prior to October 27, 2011, Are Outside of the 180-Day Limitations Period and, In Any Event, Plaintiff Has Not Asserted a Hostile Work Environment Claim in this Case.

As an initial matter, Defendant argues that certain of Plaintiff's Title VII claims are time barred because Plaintiff failed to timely file her EEOC Charge.  (Doc. 30 at 9).  Generally, an employee who has been discriminated against must file a Charge of Discrimination with the EEOC within 180 days after the alleged unlawful employment practice occurred.  42 U.S.C. § 2000e-5(e)(1).  Because a discrete retaliatory or discriminatory act "occurred" on the day that it "happened," in most circumstances, a party must file a charge within 180 days of the date of the

act or lose the ability to recover for it. 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002).  Defendant argues that because Plaintiff filed her Charge of Discrimination with the EEOC on April 27, 2012, any claim accruing before October 27, 2011 (*i.e.*, 180 days before April 27, 2012) is time barred.  (Doc. 30 at 10).

However, when addressing a hostile work environment cases, 42 U.S.C. § 2000e-5(e)(1) the court is not absolutely barred from considering certain pre-limitation events.  *See Shields v. Fort James Corp.*, 305 F.3d 1280, 1281-82 (11th Cir. 2002) (holding hostile work environment claim should be reviewed in its entirety, so long as *one* of the events comprising the claim fell in the limitations period); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120-21 (2002).  Where an act of discrimination is sufficiently related to a hostile work environment claim, such that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely, nondiscrete acts that are part of that claim.  *Chambless v. La.-Pac. Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007).

Seizing on this exception to Title VII's general time bar, Plaintiff argues that *none* of her claims are time barred because certain "unlawful actions take place well after Defendant's purported 'deadline' of October 27, 2011."  (Doc. 32 at 19-20 (citing *Shields*, 305 F.3d 1281-82)).

Plaintiff's argument is creative but suffers from at least one fatal flaw.  In this case, Plaintiff has failed to plead a hostile work environment claim.  Indeed a review of her Complaint makes clear that she has not asserted a racial harassment claim (Doc. 1). Therefore, because she has not asserted any hostile work environment claim,[12] Plaintiff cannot use *Shields* to extend the scope of the limitations period.  *Shields* holds only that "*a hostile work environment claim* should

---

[12] For this reason, any dispute about Plott's use of racially offensive language is, at most background evidence which may be connected to Plaintiff's work assignment's claim addressed below.

be reviewed in its entirety, so long as one of the events comprising it fell within the statute of limitations."   305 F.3d at 1281-82.   Unlike hostile work environment claims, discrete discriminatory and retaliatory acts are not actionable if they are time barred, even when they are related to acts alleged in timely filed charges.  *Morgan*, 536 U.S. at 113.

Therefore, any alleged discriminatory or retaliatory acts that occurred prior to October 27, 2011, are outside of the 180 day statute of limitations, and summary judgment is due to be granted on any claim accruing before October 27, 2011.

### B.    Race Discrimination

Counts I and III of Plaintiff's Complaint allege that Plaintiff suffered racially discriminatory treatment (*i.e.*, disparate treatment) in violation of Title VII and §1981.   In particular, Plaintiff claims that "Defendant intentionally discriminated against Plaintiff on the basis of her race, African-American, in violation of Title VII," and "[b]lack employees and white employees were not treated similarly."  (Doc. 1 at 10, 13).

Title VII and §1981 are subject to the same standards of proof and employ the same analytical framework.   *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).  Accordingly, the elements of §1981 race discrimination claim in the employment context are the same as a Title VII disparate treatment claim.  *Watson v. Dean Dairy Holdings LLC*, 2:12-cv-972-RDP, 2014 WL 1155799 (N.D. Ala. Mar. 21, 2014).  Because the substantive analysis for these claims is the same, it is appropriate to discuss whether Plaintiff has carried her burden with respect to both her Title VII and §1981 claims.

"Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .' "  *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1288 (11th Cir. 2003)

(quoting 42 U.S.C. § 2000e–2(a)(1)).  Plaintiff is not required to prove directly that race was the reason for the employer's challenged decision; instead, Plaintiff may rely on either direct or circumstantial evidence of discrimination.  *See, e.g.*, *id.*; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 526 (1993) ("Because Title VII tolerates no racial discrimination, subtle or otherwise, we devised a framework that would allow both plaintiffs and the courts to deal effectively with employment discrimination revealed only through circumstantial evidence." (internal quotations and citations omitted)).

Direct evidence is "evidence, which if believed, proves the existence of the fact in issue without inference or presumption."  *Maynard*, 342 F.3d at 1288 (citing *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1987)).  If plaintiff offers direct evidence and the trier of fact accepts that evidence, then the plaintiff has proven discrimination.  *McCarthney v. Griffin-Spalding Cnty. Bd. of Educ.*, 791 F.2d 1549, 1553 (11th Cir. 1986).  Here, Plaintiff offers no direct evidence of discrimination to support her claims; therefore, Plaintiff must rely on circumstantial evidence.

To prevail on a claim for discrimination under Title VII based on circumstantial evidence, Plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly-situated individual outside his protected class. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  It is undisputed that Plaintiff is a member of a protected class and that she was otherwise qualified for the position.  Defendant argues, however, that Plaintiff has failed to show she suffered an adverse employment action or that a similarly situated white employee was treated more favorably or disciplined more leniently than

Plaintiff.   (Doc. 34 at 2).   Plaintiff alleged disparate treatment in work assignments and disciplinary actions.

Because Plaintiff cannot show that Defendant treated a similarly situated employee outside of her protected class more leniently or more favorably, Defendant is entitled to judgment as a matter of law on all of Plaintiff's race discrimination claims.

> **1.    Plaintiff's Allegations Regarding the Uneven Distribution of Work Assignments Between Her and Pate Do Not Rise to the Level of an Actionable Adverse Employment Action.**

Plaintiff alleges that Plott treated her less favorably than her white coworker, Pate, in the context of work assignments.   (Doc. 1 at ¶ 9).   Plaintiff claims that Plott "usually gave Rita Pate . . . work to do instead of Plaintiff" (*id.* at ¶ 9), and Plott would always send Plaintiff out for copies while Pate stayed in the classroom.   (Ex. 1, Jenkins Dep. 42:10-14, 43:5-8).   Plaintiff claims the disparity in work assignments was related to an earlier discussion between Plott and Plaintiff, during which Plaintiff had admonished Plott for Plott's discriminatory comments about a black beauty contestant.   (*Id.* at 42:2-10).

Under a disparate treatment analysis, none of Plaintiff's claims regarding work assignments rise to the level of an actionable adverse employment action.   "It is clear . . . not all conduct by an employer negatively affecting an employee constitutes adverse employment action."   *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001).   In *Davis,* the Eleventh Circuit described an adverse employment action as follows:

> [T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Id.* at 1239. "Criticisms . . . and temporary and non-substantial changes in work assignments are not actions that have a 'serious and material effect' on the terms and conditions of employment." *White v. Hall*, 389 F. App'x 956, 960 (11th Cir. 2010); *see also Belt v. Ala. Historical Comm'n*, 181 F. App'x 763 (11th Cir. 2006) (holding minor changes in job duties, including suspending authority to order inventory and requiring reports to go through supervisor, were not adverse employment actions).

The tasks given to Plaintiff were clearly within her job duties as a paraprofessional. (*See* Ex. 1, Jenkins Dep. 34:10-23, Ex. 2, Pate Dep. 18:15-19:15). At most, Plaintiff was asked on several occasions to make copies while Pate tended to students in the classroom. Accordingly, because the court concludes the alleged differences in work assignments between Plaintiff and Pate are neither serious nor material, the differences are insufficient to rise to the level of an actionable adverse employment action.[13]

---

[13] For this reason the court need not resolve the parties' arguments about whether there are issues of fact about Plott's alleged use of racial language because any such issues are immaterial. The only claim still being pursued by Plaintiff involving Plott is Plaintiff's claim that Plott acted discriminatorily in assigning work in her classroom. It is undisputed that, in at least one instance, that the word "nigger" was used in the classroom in front of Plaintiff. (Ex. 1, Jenkins Dep. 40:22-41:15). Plaintiff testified that she told Plaintiff that her (Plott's) father worked as a Sheriff's deputy, he had used the word. (*Id.*) Pate provided a different context of the conversation:

> Two of our students were fussing at each other, and they were calling each other "nigger" . . . and Ms. Plott just got real upset with them and told them that that word was not supposed to be said at all at school or in her room; she did not like the word. . . . At one point Ms. Plott said, "Well, I don't say it now and we're not going to say it in the classroom, . . . but in days like when my daddy was younger, the word was used more often, . . . but I never liked that word and it won't be said in our classroom.

(Ex. 2, Pate Dep. 34:1-14). Of course, without question, the term "nigger" is a negative, derogatory, and inappropriate word. (*See* Ex. 5, Daria Dep. 20:6-18; Ex. 7, Fondren Dep. 31:23-32:13; Ex. 8, Wingfield Dep. 35:12-36:2; Ex. 10, McKendrick Dep. 19:3-20:5).

Plaintiff reported the incident to Daria. Pam Scott, Personnel Supervisor for Defendant, conducted an investigation, the results of which were reportedly communicated to Plaintiff (although Plaintiff apparently disputes that). (Ex. 8, Wingfield Dep. 36:9-16; Pl.'s Ex. 1 to Def.'s Ex. 3, at 85 (memorandum from Pam Scott, Personnel Supervisor, to Wingfield on April 20, 2012 presenting the findings and conclusions of the investigation.)). Wingfield's investigation concluded that no evidence supported Plaintiff's claim of harassment. (*Id.* at 3). Wingfield only criticizes Plott for crossing professional boundaries by sharing information to Plaintiff about her daughter's extracurricular activities. (*Id.*) Otherwise, Wingfield suggests "[b]ased on the findings, I do not believe Ms. Plott treated Ms. Jenkins differently because of her race." (*Id.*) Plaintiff claims Plott used the term on other

**2.      Plaintiff Concedes Her Transfer to Oak Hill Was Legitimate and Not Pretextual.**

Initially, Plaintiff's theory of the case appeared to be that her transfer to Oak Hill was the product of unlawful discrimination and retaliation. (*See* Doc. 1 at 10-16). However, the court need not decide whether Plaintiff's transfer was unlawful, because Plaintiff herself has conceded that Defendant has articulated a legitimate, nonpretextual reason for her transfer. (Doc. 32 at 25). The decision to transfer Plaintiff was (1) voluntary because Plaintiff did not wish to return to Skyland (Ex. 1, Jenkins Dep. 113:13-21), and (2) a requirement of the OCR Resolution Agreement resulting from the OCR's investigation of Plaintiff's actions with student K.T. (*See* Ex. 11, OCR Letter, Feb. 22, 2012, at 7). Thus, Plaintiff's concession is well taken. Accordingly, Defendant is due to be granted summary judgment as to Plaintiff's claims alleging discriminatory transfer.

**3.      Plaintiff Did Not Suffer From Disparate Disciplinary Treatment.**

Having conceded any challenge to her transfer, Plaintiff alleges she was singled out for more severe discipline for her actions as compared to her white coworkers, on account of her race. In cases involving alleged racial bias in the application of discipline for violation of work

---

occasions (*See* Ex. 2, Pate Dep. 34:18-20), but did not provide details about those. (*See* Ex. 2 Pate Dep. 47:9-48:7). However, beyond that single undisputed occasion, Plaintiff cannot offer a single incident where Plott again used the slur — either in her deposition or anywhere else in the record. "[O]ne who resists summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (citing *Gossett v. Du–Ra–Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978), and Fed. R. Civ. Proc. 56(e)). The Eleventh Circuit has "consistently held that conclusory allegations without specific supporting facts have no probative value." *Id.* at 1217. The court notes Pate's testimony that Plott only used the slur once. (*See* Ex. 2, Pate Dep. 34:18-20):

    Q. Have you ever heard Carol Plott use the word "nigger" to describe black people?

    A. No.

    Q. Have you ever heard Carol Plott say the word "nigger" in the classroom?

    A. That one incident.

In any event, the court need not assess what effect this conflicting evidence has in this case because, as already noted, Plaintiff cannot pursue a work assignment case in any event.

rules, a plaintiff, in addition to being a member of a protected class, must show either (1) that her employer did not believe in good faith she violated the work rule, or (2) that she engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against her were more severe than those enforced against the other persons who engaged in similar misconduct. *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989); *Winborn v. Supreme Beverage Co. Inc.*, 572 F. App'x 672, 674 (11th Cir. 2014) ("[W]hen an employee argues that he did not actually violate the rule in question, 'an employer may rebut this allegation by showing its good faith, honest belief that the employee violated [the] rule.'" (quoting *Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1136 (11th Cir. 2012)); *see also Smith v. Papp Clinic, P.A.,* 808 F.2d 1449, 1452–53 (11th Cir.1987) (noting that if an employer terminates an employee "because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race.").

Plaintiff admits that she does not know if she followed the school-approved restraint policy (Ex. 1, Jenkins Dep. 92:21-93:3); therefore, Plaintiff has fallen far short of presenting substantial evidence that Defendant did not believe, in good faith, that she violated its policy pertaining to restraint.  Instead, Plaintiff's argument turns on her assertion that she was discriminatorily disciplined or disciplined more harshly than other employees who have restrained students.  In making this claim, the burden is on Plaintiff "to show a similarity between [her] conduct and that of white employees who were treated differently."  *Jones*, 874 F.2d at 1541 (11th Cir. 1989) (citations omitted); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981) ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.").  When determining whether employees are involved in, or

accused of, the same or similar conduct and are disciplined in different ways, the Eleventh Circuit requires that "the quantity and quality of the comparator's misconduct be 'nearly identical' to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). For the reasons noted below, Plaintiff has failed to carry her burden.

Plaintiff alleges there are three incidents where (1) white school employees engaged in certain actions in violation of Defendant's school policy, but (2) unlike Plaintiff, these employees were not put on administrative leave, investigated, or otherwise disciplined. (Doc. 32 at 23). In each instance, the issue is whether Plaintiff has presented a sufficiently similar comparator to support a prima facie case of disparate treatment.

First, Plaintiff believes that "Ms. Bryant," a white employee, was observed by Sara Jordan, the Skyland janitor, picking a student up by his neck but the matter was not investigated, and Ms. Bryant was not put on administrative leave, or reprimanded. (Doc. 32 at 23). While Plaintiff was on administrative leave, Jordan allegedly handed Plaintiff a note at the grocery store informing Plaintiff of the Bryant incident. (Jenkins Dep. 154:22-155:21). Plaintiff never spoke to Jordan about the Bryant incident because while Plaintiff was on administrative leave she understood that she was to avoid communicating with Skyland employees. (*Id.* at 155:17-156:1). Plaintiff has testified that she did not know what disciplinary action, if any, was taken against Ms. Bryant. (*Id.* at 155:17-21). Nor is there any Rule 56 evidence that this alleged incident was brought to a school supervisor's attention.

Bryant is clearly not an appropriate comparator. Unless a supervisor "knew of the events, the events cannot be considered in determining whether [the plaintiff] and [another employee] are similarly situated." *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1317 n.5 (11th

Cir. 2003).  The record does not support a finding that Defendant was aware of any alleged misconduct by Bryant.  Moreover, Plaintiff offers only hearsay to support her accusation (a note passed to her away from school grounds by a co-employee); therefore, any incident involving Bryant is too speculative to support Plaintiff's theory.

Second, Plaintiff argues that the four white school employees who took part in the October 3, 2014, physical restraint of student T.R. were not put on administrative leave, investigated, or transferred.  To the extent there is any dispute as to the details of the restraint performed on the T.R., it is not material,[14] and does not preclude the entry of summary judgment in favor of Defendant.

To begin with, none of the employees involved in the incident, *including Plaintiff*, were disciplined.  Instead, the incident resulted only in the implementation of updated restraint and confrontation procedures.  (*See* Fondren Memo, Oct. 4, 2011, at 47-48).  Certainly Defendant's later disciplinary actions against Plaintiff may have taken into account past conduct — *i.e.*, Defendant may have considered Plaintiff's involvement in the October 3, 2014 incident as well as later incidents involving her.  However, Plaintiff fails to identify any person similarly involved in more than one questionable restraint who was not treated as Plaintiff was treated.  As discussed in more detail below, Plaintiff is the only Skyland employee identified by the OCR in its investigation of discriminatory conduct related to K.T.  (*See* Ex. 11, OCR Letter, Feb. 22, 2012; Ex. 11, OCR Resolution Agreement, July 9, 2012).  None of the white school employees involved in the October incident with T.R. were involved in the November incidents with K.T.

---

[14] Plaintiff claims that Blevins had her arms around T.R.'s neck, Burton had her knee in T.R.'s back, and Fondren and Irvin were also restraining the child, and in this restraint T.R. was screaming that he could not breathe. (Ex. 1, Jenkins Dep. 67:4-19).  Defendant claims, on the other hand, that Plaintiff became unnecessarily involved in an aggressive restraint of T.R.

Because Defendant treated Plaintiff exactly as she treated all of Plaintiff's proffered similarly situated white comparators, Plaintiff's comparison fails.[15]

Finally, Plaintiff argues that Plott's reported use of the word "nigger" was never investigated,[16] notwithstanding a policy that "if an employee makes an allegation of discrimination, regardless of type . . . that allegation is supposed to be investigated."  (Doc. 32 at 10 ¶ 11; Ex. 4, Daria Dep., at 101:16-23).  However, as Plaintiff also correctly acknowledges "[m]any of the allegations in this case center around Plaintiff's alleged use of improper restraint techniques against a student" (Doc. 32 at 23-24); accordingly, Plaintiff's argument that Plott violated an altogether different work rule is misplaced.  "The comparator to whom the plaintiff compares [herself] must be nearly identical to the plaintiff."  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  The court concludes Plott's alleged misconduct is not "nearly identical" to Plaintiff's.

Because Plaintiff cannot present a comparator who is similarly situated but who was disciplined less harshly, Defendant is entitled to summary judgment as a matter of law on all Title VII and §1981 race discrimination claims.  Plaintiff has not presented a Skyland employee, who was observed *repeatedly* yelling at a *student* using racially charged language *and* inappropriately restraining a student in violation of Defendant's policy.[17]

---

[15] Also, the record indicates, contrary to Plaintiff's bald assertion, that an investigation was conducted regarding the incident.  Defendant required all those employees involved to each complete an Unusual Occurrence Form.  (See Ex. 6-H, Unusual Occurrence Forms, Oct. 3, 2011, at 31-42).  A lack of punishment following receipt of these forms does not indicate a total absence of investigation.

[16] Actually, it appears the dispute is more properly characterized this way — were the results of an investigation into Plott's language communicated to Plaintiff.  On this Rule 56 record, it cannot seriously be disputed that such an investigation took place.  *See* footnote 13 *supra*.

[17] Furthermore, Plaintiff also cannot provide a comparator whose actions were the basis of an OCR investigation resulting in a resolution agreement demanding the employee be transferred or terminated.

Therefore, Plaintiff's race discrimination claim for disparate discipline must fail as a matter of law.  Accordingly, summary judgment is due to be granted in favor of Defendant on each of Plaintiff's claims of race discrimination.

**C.     Retaliation**

Counts II and IV of Plaintiff's Complaint allege retaliation pursuant to Title VII and §1981.  (Doc. 1).[18]  Plaintiff bears the initial burden of establishing a prima facie case of retaliation.  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the two.  *Id.* at 1266.

Plaintiff alleges that she engaged in two forms of protected activity.  First, Plaintiff contends that she was retaliated against after complaining about harassment in March 2012 to Defendant.  Second, after the October 20, 2011 incident involving Plaintiff, Dumas, and Fondren, Plaintiff purportedly engaged in protected expression by refusing to sign a false statement against Dumas at the request of Fondren.  (Ex. 1, Jenkins Dep. 64:1-5).  Plaintiff argues that since she refused to sign the statement, she has been routinely investigated by Defendant for her actions restraining students while other, white employees, who also participated in the restraint of students, were not investigated.  (Doc. 32 at 24-25).  The court assumes without deciding that Plaintiff engaged in statutorily protected expression; however, for the reasons outlined below, Plaintiff cannot show she suffered an adverse employment action which was casually connected to her protected expression.

---

[18] Again, because both Title VII and §1981 claims are analyzed under the same analytical framework, the court addresses both claims simultaneously.  *See Bryant*, 575 F.3d at 1296 n.20.

1.    **Plaintiff Cannot Establish a Prima Facie Case of Retaliation Because She Suffered No Adverse Employment Action.**

Although Plaintiff concedes her transfer to Oak Hill was legitimate, nondiscriminatory, and not pretextual, Plaintiff now argues that Defendant's independent investigations of Plaintiff demonstrate that Defendant routinely condoned behavior among white employees that it did not permit of blacks. (Doc. 32 at 25).[19]  Therefore, Plaintiff claims the unique level of scrutiny that Defendant placed on Plaintiff (*i.e.*, its investigation of her) constituted an adverse employment action.

The record reveals that Plaintiff has suffered no adverse employment action. An adverse employment action is "an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Plaintiff's argument that Defendant's investigation regarding the restraint of student K.T. fails meet this standard.

The Eleventh Circuit has held that the initiation of an internal investigation of this type against an employee does not constitute an adverse employment action. *Rademakers v. Scott*, 350 F. App'x 408, 412-13 (11th Cir. 2009); *Rogers v. Ga. Dep't. of Corr.*, 5:10-cv-499-MTT, 2012 WL 5398804, *7 (M.D. Ga. Nov. 2, 2012) (citing *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006)). "An internal investigation is not an adverse employment action when it does not result in a significant change in employment status, such as termination,

---

[19] Plaintiff alleges that "[i]f Defendant had legitimate, non-pretexual concerns about the method of restraint used on students by educators, it would have *investigated* all employees involved in the restraint of student K.T. and T.R.; instead, Defendant investigated the only black employee involved in these incidents." (Doc. 32 at 25).

demotion, failure to promote, significant reassignment or a significant change in benefits." *See*

*Vandesande v. Miami-Dade Cnty.*, 431 F. Supp. 2d 1245, 1253 (S.D. Fla. Apr. 7, 2006).

Because Defendant's internal investigation resulted in no significant change to Plaintiff's

employment status, Plaintiff cannot point to any adverse employment action she suffered.  For

this independent reason, Defendant is therefore entitled to judgment as a matter of law on all of

Plaintiff's retaliation claims.

> **2.      Plaintiff Cannot Establish a Prima Facie Case of Retaliation Because There Was No Causal Connection Between Plaintiff's Protected Activity and Any Adverse Employment Action.**

Even if Defendant's internal investigation of Plaintiff constituted an adverse employment

action, Plaintiff still cannot establish a causal relationship between either of Plaintiff's

purportedly protected activities and any adverse employment actions.  This is the case because

Plaintiff cannot show a causal connection between any protected activity and the investigations

into her conduct.

At the outset, Plaintiff cannot establish a causal relationship between Plaintiff's March

2012 complaint and the alleged adverse employment actions.   "[W]hen an employer

contemplates an adverse employment action before an employee engages in protected activity,

temporal proximity between the protected activity and the subsequent adverse employment

action does not suffice to show causation."  *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir.

2006).

Here, the allegedly adverse employment actions -- investigation, leave, and discipline --

occurred *before* Plaintiff's complained of alleged mistreatment.   On February 22, 2012,

Defendant's representatives met with Plaintiff and advised her that she would be returning to

work from administrative leave.  Plaintiff was also advised that she would be serving as an aide

at Oak Hill through the end of the school year, May 2012.   (Ex. 1, Jenkins Dep. 110-13).

Because the transfer process began prior to the time that Plaintiff lodged her March 2012 complaint, Plaintiff cannot show her complaint led to her transfer. *See Drago*, 453 F.3d at 1308. It follows that Plaintiff's claim for unlawful retaliation based on her March 2012 complaint necessarily fails.

Plaintiff is also unable to establish a causal connection between any adverse action and her refusal to sign a statement against Dumas. Initially, Plaintiff alleged in her EEOC Charge that she was falsely accused of restraining a student on October 3, 2011 because she failed to sign a statement against Dumas. (Ex. 1-A, EEOC Charge at 2). As discussed above, Plaintiff now argues that Defendant's investigation into the incident focuses on Plaintiff and ignores the four other white Skyland employees that were involved. Defendant argues, Plaintiff cannot establish causation since the protected activity (*i.e.*, refusing to sign a statement against Dumas regarding the October 20, 2011 incident), occurred *after* the alleged adverse employment action (*i.e.*, the false accusal in the October 3, 2011 incident). Plaintiff claims she was not put on leave or notified of any investigation into the matter until December 6, 2011. (*See* Doc. 32 at 17, 25-26).

The record does not support Plaintiff's theory. First, Fondren memorialized concerns that Plaintiff improperly restrained T.R. as early as October 4, 2011, in an email from Fondren to Debbie Anderson, Dorothy Richardson, Vicki Brown, and Michael Daria. (Ex. 6-I, Fondren Email, Oct. 4, 2011, at 44). Fondren wrote, "I was very concerned over the assistance provided by [Plaintiff]. Several teachers have come to me with concerns about the amount of force used." (*Id.*) It is clear, therefore, that Plaintiff was accused of improper restraint well before engaging in any allegedly protected activity.

Moreover, the record indicates that the December 5, 2011 meeting with Plaintiff placing her on administrative leave, and the March 8, 2012 reprimand relate to the November restraint of student K.T., not the October restraint of student T.R. (Ex. 6-O, Fondren Memo, Dec. 5, 2011, at 33; *see also* Ex. 1, Jenkins Dep. 94:7-97:1 (testifying Plaintiff understood the investigation and leave related to the November incident with K.T.); Ex. 5-B, Daria Letter, Mar. 8, 2011, at 160-61 (noting the "two primary concerns stem from incidents on November 3, 2011 and November 4, 2011")).

Therefore, contrary to Plaintiff's assertions in her EEOC Charge, Plaintiff could not have been falsely accused of restraining a student on October 3, 2011, because she failed to sign a statement against Dumas on October 20, 2011.[20]  Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claims.

### 3. Even if Plaintiff Can Establish a Prima Facie Case, Defendant Offers a Legitimate, Nondiscriminatory Reason for the Investigation into Plaintiff and Reprimand and Plaintiff Has Not Shown that the Reason is a Pretext.

Assuming a plaintiff could establish a prima facie case of retaliation, the burden shifts to the defendant to articulate legitimate, nondiscriminatory reasons for the alleged acts of retaliation.  *See Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).  As noted above, Plaintiff has conceded that the Defendant has articulated a legitimate, nonpretextual reason for her *transfer*.  (Doc. 32 at 25 (acknowledging the OCR Resolution Agreement mandated that

---

[20] In Plaintiff's opposition to Defendant's Motion for Summary Judgment, Plaintiff alters her claim laid out in her EEOC Charge of Discrimination.  Plaintiff alleges Defendant retaliated against her refusal to sign a statement against Dumas by investigating her actions restraining K.T. in November.  (*See* Doc. 32 at 25 ("On October 20, 2011, Plaintiff engaged in the protected expression of refusing to sign a false statement against a co-worker when requested to do so by Dr. Fondren. . . . Subsequently, the incident with student K.T. transpired.  Dr. Fondren then instigated the adverse employment action of commencing an investigation into Plaintiff . . . .")).  Even were the court to consider this new theory, Plaintiff still loses as a matter of law.  As a threshold matter, Defendant's investigation still does not constitute an adverse employment action.  Moreover, as discussed in more detail below, Defendant had a legitimate, nondiscriminatory reason for investigating Plaintiff, putting Plaintiff on administrative leave with pay, and transferring Plaintiff.

Plaintiff be transferred)).   But, Plaintiff now alleges that "[i]f Defendant had legitimate, non-pretexual concerns about the method of restraint used on students by educators, it would have *investigated* all employees involved in the restraint of student K.T. and T.R.; instead, Defendant investigated the only black employee involved in these incidents."  (Doc. 32 at 25).

Defendant's burden at the second stage of the *McDonald Douglas* analysis "is exceedingly light." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994).  The burden is one of production not persuasion, and it does not involve a credibility assessment. *Reese v. Sanderson Plum. Prods. Inc.*, 530 U.S. 133, 142 (2000).  To satisfy that burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)).

The fact that Plaintiff's involvement was the subject of further investigation following the November 4 restraint incident does not indicate any retaliatory conduct here.  The record clearly indicates legitimate, nondiscriminatory bases for Defendant's focus on Plaintiff.  Plaintiff was the only person involved in the October 3 restraint of T.R., the November 3 verbal altercation with K.T., and the November 4 restraint of K.T.  These three incidents occurred within a span of thirty-three days, and Plaintiff is the *only* common thread connecting the questionable student interactions.

As discussed above, following the October 3 incident involving T.R., neither Plaintiff nor any of the white employees suffered any adverse employment action, and Plaintiff suffered no

disparate treatment. Plaintiff cannot indicate any subsequent action by the white employees involved in the restraint of T.R. that warranted an investigation by Defendant.

Similarly, although Plott and Plaintiff were both involved in the November 4 restraint of K.T., the undisputed facts indicate that additional investigation of Plott was clearly not necessary. Unlike Plott, Plaintiff was involved with an incident on November 3, the day before, in which Plaintiff was accused of verbally taunting and threatening K.T. (*See* Ex. 6, Fondren Aff. ¶ 20; Ex. 3, Plott Dep. 62:6-23; Ex. 6-M, Blevins Email, Nov. 4, 2011, at 12; Ex. 6-M, Jackson Email, Nov. 3, 2011, at 13; Ex. 6-O, Fondren Memo, Dec. 5, 2011, at 33). By the time the November 4 restraint incident had taken place, the November 3 had been communicated to the Skyland administration (*see* Ex. 6-M, Blevins Email, Nov. 4, 2011, at 12; Ex. 6-M, Jackson Email, Nov. 3, 2011, at 13), providing a good faith basis for additional inquiry into Plaintiff's conduct.

Additionally, there is also no evidence to support the allegation that Plott's actions were not investigated after the November 4 restraint incident. It is undisputed that both Plott and Plaintiff attempted to restrain K.T. on that day, and Defendant received reports from all witnesses regarding the entire restraint incident — not simply about Plaintiff's involvement. (*See* Ex. 6-N, Unusual Occurrence Forms, Nov. 4, 2011, at 15-31). Throughout the reports, Plott plays the role of victim in the incident — becoming injured in a failed attempt to restrain K.T. Nothing about Plott's attempt suggests anything improper. On the other hand, the accounts clearly show that Plaintiff fully restrained K.T. Therefore, Defendant's initial investigation, as embodied by these reports of the incident, provide a legitimate basis for further investigating Plaintiff as opposed to Plott.

Moreover, the conclusion that Defendant's further investigation of Plaintiff was not discriminatory is confirmed by the result of OCR's independent investigation into Plaintiff's conduct. Following his/her parent's complaint about Plaintiff's conduct, the OCR investigated, and, in effect, singled out Plaintiff with respect to her interaction with K.T. As a result of that process, the OCR entered a Resolution Agreement demanding Plaintiff's transfer or termination. (Ex. 11, OCR Letter, Feb. 22, 2012; Ex. 11, OCR Resolution Agreement, July 9, 2012). Defendant was also required to inform all families of children who had been supervised or contacted by Plaintiff of the school's policies regarding seclusion and physical restraint, and provide them with contact information should they have questions or wish to file a complaint. (Ex. 11, OCR Resolution Agreement, July 9, 2012, at 3).

Taken together, it is undisputed that Plaintiff came into the November 4 incident with a unique history of questionable student interactions. Accordingly, Defendant clearly had a good faith basis upon which to isolate Plaintiff for further investigation following the November 4 incident. Because Plaintiff cannot establish that the Defendant's legitimate, nondiscriminatory reasons for independently investigating Plaintiff are pretext for retaliation, Defendant is entitled to summary judgment on Plaintiff's retaliation claims.

### D.  Supplemental Jurisdiction over Plaintiff's State Law Claims

Having disposed of Plaintiff's federal claims, the court acknowledges that it has the discretion to exercise supplemental jurisdiction over Plaintiff's remaining state law conversion claim. 28 U.S.C. § 1367(a). However, the converse is true as well — the court also has the discretion to decline to continue to exercise jurisdiction because all claims over which the court had original jurisdiction are being dismissed.[21]  *Id.* at § 1367(c)(3). The Eleventh Circuit has

---

[21] Pursuant to section 1367(c), a district court has discretion to decline to exercise supplemental jurisdiction in four situations: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates

encouraged district courts to decline to exercise supplemental jurisdiction over any remaining state claims when, as here, the federal claims have been dismissed prior to trial. *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004). Therefore, having determined that there is no longer a basis for federal jurisdiction over Plaintiff's remaining state law claim,[22] the court declines to exercise supplemental jurisdiction. Accordingly, this case is due to be dismissed without prejudice, so that Plaintiff may refile this claim in the appropriate state court.

## V.    Conclusion

For the reasons discussed above, Defendant's Motion for Summary Judgment (Doc. 28) is due to be granted. Plaintiff has failed to allege facts which, taken as true, demonstrate genuine issues of material fact that would entitle Plaintiff to relief on her federal law claims. No evidence has been offered to demonstrate that Plaintiff suffered any unlawful discrimination or retaliation for engaging in protected expression. Furthermore, the court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law conversion claim. Accordingly, Plaintiff's state law conversion claim is due to be dismissed without prejudice.

A separate order in accordance with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this December 9, 2014.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

---

over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). "Any one of the section 1367(c) factors is sufficient to give the district court discretion to dismiss a case's supplemental state law claims." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006).

[22] There is no diversity jurisdiction under 28 U.S.C. § 1332 because Plaintiff and Defendant are both residents of the state of Alabama.